*In re* JACOBS

DEPARTMENT OF SOCIAL SERVICES v SMITH

Docket Nos. 83035, 83116. Argued April 4, 1989 (Calendar No. 9). Decided August 1, 1989.

The Department of Social Services petitioned the Chippewa County Probate Court to assume jurisdiction, under MCL 712A.2(b)(2); MSA 27.3178(598.2)(b)(2), of Jeffrey Jacobs and Forest Jacobs, minor children of Lorraine Smith and Scott Jacobs on the ground of neglect, alleging that Lorraine Smith's physical afflictions limited her ability to provide direct care for the children and that she was unable to provide the children adequate shelter. The court, Lowell R. Ulrich, J., assumed jurisdiction. The Court of Appeals, WAHLS, P.J., and MAHER, J. (T. K. BOYLE, J., dissenting), reversed in an unpublished opinion per curiam, holding that for purposes of § 2(b)(2) some culpability or blameworthiness must be established by a preponderance of the evidence to justify such an exercise of jurisdiction (Docket No. 97841). The department appeals.

In an opinion by Chief Justice RILEY, joined by Justices BRICKLEY, GRIFFIN, and ARCHER, the Supreme Court *held:*

Culpable neglect need not be shown to support an exercise of jurisdiction under MCL 712A.2(b); MSA 27.3178(598.2)(b) over a child by a probate court.

1. The juvenile division of a probate court may acquire jurisdiction over a child under eighteen years of age, found within the county, where, under § 2(b)(1), the parent or guardian, when able to do so, neglects to provide proper or necessary support or care or where, under § 2(b)(2), the home or environment is an unfit place for the child to live. The standard under § 2(b)(1) is subjective, requiring culpability, whereas the standard under § 2(b)(2) is objective, mandating an inquiry into whether there is neglect in fact, rather than an examination of its causes. There is no element of mens rea.

2. A probate court may terminate parental rights under

REFERENCES

Am Jur 2d, Indians §§ 63-65; Infants §§ 22, 23.
See the Index to Annotations under Indians; Neglect of Child.

§ 19(b)(3) of the Juvenile Code where it finds by clear and convincing evidence that the parent, without regard to intent, failed to provide proper care for a child and there is no reasonable expectation that the parent will be able to do so within a reasonable time. Permitting final termination of parental rights on the basis of neglect without regard to intent supports the conclusion that culpable neglect need not be shown at the jurisdictional phase of a proceeding. When the state intervenes at the adjudicative stage, substantial effort is expended to improve the home situation and to return the child to the custody of the parents if at all possible. Requiring a finding of culpable neglect before the state's resources may be employed to help remedy unsatisfactory living conditions would frustrate these goals and would improperly shift the focus of the proceeding from the child to the parent.

3. Ordinarily the standard of proof for a probate court's exercise of jurisdiction under MCR 5.908(A)(1)(a) is by a preponderance of the evidence. However, because the children in the instant case are members of the Chippewa Tribe, the Indian Child Welfare Act, 25 USC 1912(e), applies, and the appropriate standard, therefore, is clear and convincing evidence.

4. In this case, the probate court properly assumed jurisdiction over the children. In light of the respondent's admissions and other evidence presented at the adjudicative hearing, the home environment was unfit. The court's exercise of jurisdiction pursuant to § 2(b)(2) was supported by clear and convincing evidence.

Reversed.

Justice LEVIN, joined by Justice CAVANAGH, dissenting, stated that while § 2(b) does not provide for a finding of "culpable neglect," it does, absent a finding of cruelty, drunkenness, criminality, or depravity, require a finding of "neglect." A finding that the home or environment is an unfit place for the child to live in does not suffice to confer jurisdiction on the probate court unless the home or environment is unfit by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of the parent.

The decision of the Court of Appeals should be vacated and the case remanded to the probate court for further proceedings because:

(1) Although there is no statutory requirement of culpability there is a statutory requirement of neglect under both subsection (1) and subsection (2) or § 2(b).

(2) Although the jurisdictional allegation in the amended

petition was grounded in § 2(b)(1), the probate court found neglect on the basis of § 2(b)(2).

(3) There was no evidence that either of the children, who had been in foster care under the supervision of Protective Services for over six weeks when the amended petition was filed, were in fact neglected.

(4) While the probate court found that jurisdiction was established under § 2(b)(2), it did not expressly find neglect or state how the children had been neglected or that the mother's physical limitations and multiple residences had resulted in neglect of the children.

In this case, there is no basis in the record for a finding that the mother was not a caring and concerned mother who wanted to provide for her children. The children were not in fact neglected. Her action in taking her children to protective services for shelter was not neglect, nor were the children in an unfit home. The probate court, thus, had no authority to assume jurisdiction over the children and thereby empower itself at some future time to terminate her parental rights without regard to intent simply because—rather than neglect her children—she turned to Protective Services for assistance in caring for them.

A probate court may not draw an inference of neglect on the basis of a parent's resort to Protective Services for assistance. Nothing in the statute requires judicial intervention before Protective Services can provide assistance. Rather, the statute contemplates that the state's resources be employed to provide necessary assistance and that judicial intervention be deferred unless there is neglect and the providing of services will not rectify the situation.

Justice BOYLE took no part in the decision of this case.

1. COURTS — PROBATE COURTS — JUVENILE DIVISION — NEGLECT — JURISDICTION.

Culpable neglect need not be shown to support an exercise of jurisdiction over a child by a probate court (MCL 712A.2[b]; MSA 27.3178[598.2][b]).

2. COURTS — PROBATE COURTS — JUVENILE DIVISION — NEGLECT — JURISDICTION — NATIVE AMERICAN CHILDREN.

Ordinarily the standard of proof for a probate court's exercise of jurisdiction is by a preponderance of the evidence; however, where the children are members of a tribe as defined by the Indian Child Welfare Act, the appropriate standard is clear and convincing evidence (MCR 5.908[A][1][a]; 25 USC 1912[e]).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Patrick M. Shannon,* Prosecuting Attorney, and *Mark Louis Dobias,* Assistant Prosecuting Attorney, for the Department of Social Services.

*John W. Leudesdorff,* Guardian Ad Litem, for the minor children.

*Lewinski & Brewster, P.C.* (by *Paul M. Brewster*), for the respondents.

RILEY, C.J. We are asked in this case to decide whether a probate court may acquire jurisdiction over a child under the neglect provision of MCL 712A.2(b)(2); MSA 27.3178(598.2)(b)(2) without a finding that the neglect is culpable. In light of the plain language of § 2(b) and established legislative purpose of the juvenile code, we hold that culpable neglect need not be shown to support an exercise of jurisdiction by a probate court under § 2(b)(2).

I

Respondents Lorraine Smith and Scott Jacobs are the parents of the two minor children involved in this case, Jeffrey Jacobs, born June 4, 1984, and Forest Jacobs, born March 27, 1986.

In April of 1986, respondent Smith suffered an intracranial hemorrhage which caused, among other things, partial blindness, atrophy of the muscles in the extremities, and a serious impairment of motor skills.

In early October of that year, Ms. Smith and Mr. Jacobs returned from Wisconsin to Sault Ste. Marie, Michigan. At that point, the couple apparently separated. The children remained with their mother. Ms. Smith and the two children moved in with Smith's parents for approximately one week.

The respondent then took her children to a domestic violence center. Because the center was not equipped to meet the needs of her children, Ms. Smith moved them to the Hiawathaland Home. When this relocation also proved unsuitable, the respondent contacted the Chippewa County Department of Social Services for assistance.

On October 10, 1986, the children were placed in temporary foster care. Three days later, the DSS petitioned the Chippewa County Probate Court to assume jurisdiction over the children on the ground of neglect under MCL 712A.2(b)(1) or (2); MSA 27.3178(598.2)(b)(1) or (2). Specifically, the petitioner alleged that the respondent's physical afflictions "limit her ability to provide direct care to her children" and that the respondent "is without adequate shelter arrangements for her children."[1]

At a preliminary hearing, the respondent admitted the allegations in the petition.[2] Accordingly, the court ordered that the children remain in foster care pending a formal hearing on the matter.

A formal hearing was held on November 14, 1986. At this time, the court permitted the DSS to amend its petition due to "changed circumstances"[3] and ordered an adjudicative hearing on December 3, 1986.

At the adjudicative hearing, the respondent conceded many of the allegations in the amended petition. Specifically, the respondent admitted that

[1] The petition also maintained that the father was unable to care for the children. Apparently Mr. Jacobs was living with his mother, Donna Jacobs, who was scheduled to undergo surgery in November and therefore would not be in a position in the immediate future to help care for the children.

[2] The preliminary hearing was conducted on October 13, 1986, the same day the DSS filed its petition in the probate court.

[3] The DSS filed an amended petition on November 20, 1986.

her children are members of the Chippewa Tribe;
that she suffered complications from a brain hema-
toma which has impaired her ability to provide
proper or direct care to her children; that since
her return to Sault Ste. Marie on October 3, 1986,
she has lived in approximately seven residences
including her parents' home, a domestic violence
shelter, the Hiawathaland Home, and at least two
adult foster care residences; and that she had
visited her children regularly since their place-
ment in foster care.

The respondent testified that she was currently
living in her cousin's home and that the children
could not be cared for there. The respondent ex-
plained, however, that she would be making ar-
rangements later that day to rent a trailer where
both she and the children could live. Ms. Smith
admitted that because of her limp and the limited
dexterity in her left hand, she was unable to care
for the children herself. According to the respon-
dent, she would require assistance in changing
diapers and holding the children. The respondent
further testified that she had arranged for a young
woman to move in and help tend the children.[4]

At the conclusion of the adjudicative hearing,
the court assumed jurisdiction over the children
on the basis of neglect pursuant to § 2(b)(2), stating
that it was "satisfied by clear and convincing
evidence . . . as a result of the admissions
. . . that these children are properly within the
jurisdiction of the Court . . . ."

Citing *In re McDuel,* 142 Mich App 479; 369
NW2d 912 (1985), counsel for the respondent as-
serted that the court's exercise of jurisdiction was
improper because there had been no showing of

---

[4] The respondent met the eighteen-year-old woman in October of
1986. The woman had been a volunteer at the domestic violence
shelter.

blameworthiness on the part of the mother. According to counsel, "[the respondent's] physical incapacity does not constitute neglect." The court rejected this argument, explaining that culpability was required only in the dispositional phase of a termination proceeding and not in the adjudicative phase wherein a court merely decides whether or not to assume jurisdiction over the affected children. According to the court, *McDuel* was inapplicable because it involved the dispositional stage of a termination proceeding. The court then ruled that the children should remain in foster care and scheduled a dispositional hearing for December 29, 1986.[5]

In a split decision, the Court of Appeals reversed the decision of the probate court, holding that "for purposes of subsection 2(b)(2), some culpability or blameworthiness must be established by a preponderance of the evidence in order to justify the exercise of jurisdiction by a probate court over a child under 17 years of age." *In re Jacobs,* unpublished opinion per curiam of the Court of Appeals,

---

[5] At the dispositional hearing, the court observed the testimony of Ms. Smith, two DSS social workers assigned to the case, a medical doctor who had evaluated the respondent, and the friend with whom the respondent was then living. At the conclusion of this hearing, the court decided to adopt the placement plan of one of the case workers. Under the plan, the children would remain in their present foster home for approximately four weeks, at which time they would be reunited with their father in the grandmother's home (assuming the grandmother had recovered satisfactorily). The current visitation schedule would remain intact.

The court entered a six-month order and mandated that the case be reviewed in ninety days. According to the case worker, the plan would allow the DSS to render additional services to the father and grandmother in caring for the children. However, the court admonished Mr. Jacobs that he should accept more responsibility for the care of his children. Finally, the court ordered Ms. Smith to coöperate with the DSS and to obtain a neuropsychological evaluation. (Testimony indicated that Ms. Smith had neglected to inform the DSS of her numerous address changes and failed to keep administrative and medical appointments.)

decided April 12, 1988 (Docket No. 97841), slip op, p 5.[6] The majority reasoned:

> The two types of proceedings in juvenile court, adjudicative and dispositional, form a continuum at the end of which the parental rights of a respondent may be permanently terminated on the basis of a child's neglect as brought about through some blameworthy act or omission by the respondent. If, at the adjudicative phase of a proceeding, there is absolutely no requirement to show blameworthiness or culpability on the part of the respondent to support the petitioner's allegations of neglect under MCL 712A.2(b)(2); MSA 27.3178(598.2)(b)(2), then probate courts will be free to assume jurisdiction over children in parental rights termination cases in which there is correspondingly absolutely no possibility at that time of terminating parental rights on the basis of neglect under MCL 712A.19a(e); MSA 27.3178(598.19a)(e). We do not believe that probate courts are permitted under the jurisdictional statute to assume jurisdiction over a child based on the non-culpable neglect of a respondent and then to conduct a judicial fishing expedition in search of some evidence of culpability to serve as a basis for the termination of the respondent's parental rights. [*Id.,* p 7.]

Visiting Judge T. K. BOYLE dissented, stating that "the majority has seriously erred in reading into jurisdictional § 2(b) the judicial interpretation of the term 'neglect' created in the context of terminating an individual's parental rights under the Michigan juvenile code." *Id.,* p 1.[7]

---

[6] The Court of Appeals ordered the probate court to hold a new adjudicative hearing "after which a determination of jurisdiction will be made based on the interpretation of the term 'neglect' as set forth in this opinion." *Id.,* p 9.

[7] I am unable to agree that either the language of jurisdictional § 2(b) or the evident legislative purpose of the juvenile code permits [the majority's] conclusion. [*Id.,* p 2 (BOYLE, J., dissenting).]

On June 22, 1988, we granted leave to appeal. 430 Mich 892 (1988).

II

At the time of the adjudicative hearing in the instant case, MCL 712A.2(b); MSA 27.3178(598.2)(b) provided that the juvenile division of the probate court may acquire jurisdiction over any child under eighteen years of age found within the county:

> (1) Whose parent or other person legally responsible for the care and maintenance of the child, *when able to do so,* neglects or refuses to provide proper or necessary support, education as required by law, medical, surgical, or other care necessary for his or her health or morals, or who is deprived of emotional well-being, or who is abandoned by his or her parents, guardian, or other custodian, or who is otherwise without proper custody or guardianship.
>
> (2) *Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, or other custodian, is an unfit place for the child to live in.* [Emphasis added.][8]

---

[8] Section 2(b) of the code was amended by 1988 PA 224 as follows:

(b) Jurisdiction in proceedings concerning any child under 18 years of age found within the county:

(1) Whose parent or other person legally responsible for the care and maintenance of the child, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, *who is subject to a substantial risk of harm to his or her mental well-being,* who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship. As used in this subparagraph:

(A) *"Education" means learning based on an organized educational program that is appropriate, given the age, intelligence, ability, and any psychological limitations of a child, in the subject areas of reading, spelling, mathematics, science, history, civics, writing, and English grammar.*

(B) *"Without proper custody or guardianship" does not in-*

"Neglect" is not defined in the juvenile code, although the term appears in both the jurisdictional provisions quoted above and the subsection governing the termination of parental rights, MCL 712A.19a(e); MSA 27.3178(598.19a)(e).[9] In our view, a comparison of these jurisdictional provisions sheds light on the proper construction of "neglect" in § 2(b)(2).

According to § 2(b)(1), jurisdiction may be conferred upon the probate court if a parent, "when able to do so," neglects or refuses to provide necessary support or care. This subsection, which uses "neglect" as a verb, is subjective on its face. By inserting "when able to do so," the Legislature has created a "built-in" culpability requirement.

Subsection 2(b)(2), on the other hand, uses "neglect" as a noun and speaks to the objective condition of the home. Jurisdiction may be conferred under this subsection if the home is *in fact* an

*clude the situation where a parent has placed the child with another person who is legally responsible for the care and maintenance of the child and who is able to and does provide the child with proper care and maintenance.*

(2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, or other custodian, is an unfit place for the child to live in. [Emphasis added.]

As indicated, the primary purpose of the amendment was to define "education" and "without proper custody or guardianship" as those terms are used in § 2(b)(1). Section 2(b)(2), the provision at issue here, remains unchanged.

[9] MCL 712A.19a; MSA 27.3178(598.19a) provided:

Where a child remains in foster care in the temporary custody of the court following the initial hearing provided by section 19, the court may make a final determination and order placing the child in the permanent custody of the court, if it finds any of the following:

*     *     *

(e) The parent or guardian is unable to provide a fit home for the child by reason of neglect.

unfit place for the child to live. This subsection, by its own terms, mandates an inquiry into the objective state of being neglected rather than an examination of the individual causes or reasons for the neglect. We agree with Judge BOYLE that § 2(b) contemplates the assumption of jurisdiction in both situations.

The respondent asserts that because "neglect" is not expressly defined in the act, the term should be given "its plain and ordinary meaning." According to Webster, the verb "neglect" means "to give little attention or respect to: Disregard: to leave undone or unattended to esp. through carelessness." *Webster's Ninth New Collegiate Dictionary* (1985), p 791. The respondent interprets this definition to suggest that a person may only neglect something intentionally or carelessly. We disagree. In our view, this definition is devoid of any requirement of specific intent or culpability. In any event, as stated previously, "neglect" as used in § 2(b)(2) is a noun, which is defined by Webster as "the condition of being neglected." *Id.* This definition contains no element of mens rea.

The respondent further contends that because "neglect" is given as a basis for jurisdiction along with "cruelty, drunkenness, criminality, or depravity" in § 2(b)(2), the Legislature must have intended to incorporate an element of culpability. According to the respondent, each of the enumerated conditions suggests some degree of fault or blameworthiness on the part of the parent. Thus, because "neglect" was included in this list, that condition must also imply a certain degree of culpability. We disagree. In our view, had the Legislature intended to require "culpable neglect" or "intentional neglect" in § 2(b)(2), it could have readily stated so.

### III

In requiring a finding of culpable neglect at the jurisdictional stage, the Court of Appeals relied on a line of recent decisions interpreting "neglect" in § 19a(e). *In re Bedwell,* 160 Mich App 168; 408 NW2d 65 (1987) (involving an emotionally disturbed mother); *In re Tedder,* 150 Mich App 688; 389 NW2d 149 (1986), lv den 426 Mich 874 (1986) (involving a paranoid schizophrenic parent); *In re McDuel, supra* (involving a parent inflicted with multiple sclerosis and confined to a wheelchair); *In re Bailey,* 125 Mich App 522; 336 NW2d 499 (1983) (involving mentally retarded parents). See also *In re Kellogg,* 157 Mich App 148; 403 NW2d 111 (1987) (involving a parent with a history of alcohol abuse, manic depression, and attempted suicide). But see *In re Sterling,* 162 Mich. App 328; 412 NW2d 284 (1987), certified conflict declined 429 Mich 1210 (1987) (involving parental drug and alcohol abuse).

Except for *Sterling,*[10] each of these cases holds that to be neglectful under the termination statute, a parent must "have committed some act or omission which is blameworthy. We cannot assign blame to one who is incapacitated by disease." *McDuel, supra,* p 486.[11] Given this interpretation of "neglect" in § 19a, the Court of Appeals in the

---

[10] In *Sterling,* the Court of Appeals expressly declined to follow the *Bailey-McDuel-Tedder* line of cases, holding that "a finding of culpability or intent to neglect is not a legislative requirement for the termination of parental rights under § 19a(e)." *Sterling, supra,* p 337. In dicta, the panel also stated that culpability would not be required for the initial exercise of jurisdiction. *Id.,* p 339.

[11] Other panels of the Court of Appeals have affirmed termination orders under § 19a(e) without even mentioning a finding of culpability or blameworthiness. *In re Riffe,* 147 Mich App 658; 382 NW2d 842 (1985), lv den 424 Mich 904 (1986); *In re Slis,* 144 Mich App 678; 375 NW2d 788 (1985); *In re Harmon,* 140 Mich App 479; 364 NW2d 354 (1985).

instant case reasoned that culpability must also be read into "neglect" in § 2(b)(2):

> A provision should be read in connection and in harmony with the rest of the statute. *Cliffs Forest Products Co v Al Disdero Lumber Co,* 144 Mich App 215, 222; 375 NW2d 397 (1985), lv den 424 Mich 896 (1986). It would be anomalous, inconsistent, and unwise to define "neglect" in two different ways within the same statute. We consider logic, fairness, and common sense to require congruity in the judicial interpretation of the term "neglect" as it appears in the jurisdictional and permanent custody provisions of the probate code . . . . [*Jacobs, supra,* slip op, p 7.]

We reject this construction of § 2(b)(2). The Court of Appeals cites no authority for its proposition that "neglect" in § 2(b)(2) must be interpreted in the same manner as "neglect" in the termination statute. In our view, because the jurisdictional and termination provisions serve completely different functions in the juvenile code,[12] the meaning of "neglect" in each statute should be explored independently.

In any event, the Legislature has recently eliminated any ambiguity regarding the requirement of culpable neglect in § 19a(e). 1988 PA 224, which

---

[12] At the time of the child protective proceedings in the instant case, Michigan Court Rules and case law recognized the clear distinction between the *adjudicative phase* where the court "determines whether the child comes within the court's jurisdiction under the juvenile code [§ 2(b)] as alleged in the petition" and the *dispositional phase* where the court determines "measures to be taken . . . with respect to the child and adults properly within its jurisdiction." MCR 5.908(A)(1)(a) and (2)(a). Because a dispositional hearing could result in the ultimate termination of parental rights pursuant to § 19a, a higher standard of proof is required. According to MCR 5.908(C)(2), the standard of proof at the termination stage is "clear and convincing evidence" while the standard at the initial jurisdictional level is merely "proof by a preponderance of the evidence." See also *Fritts v Krugh,* 354 Mich 97, 110-112; 92 NW2d 604 (1958); *In re Riffe, supra,* pp 668-669.

became effective April 1, 1989, modifies several provisions of the juvenile code. See, e.g., n 8. Pertinent to our analysis is newly amended § 19b(3)(d):

> (3) The court may terminate the parental rights of a parent to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> \* \* \*
>
> (d) The parent, *without regard to intent,* fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the age of the child. [Emphasis added.]

In our view, permitting final termination on the basis of neglect (or, according to the new statutory language, for the "fail[ure] to provide proper care") without regard to intent supports our conclusion that culpable neglect need not be shown at the jurisdictional phase of the proceeding. If culpability or blameworthiness is not required for final disposition, it certainly would not be required at the initial adjudicative stage, where the court merely decides whether or not to assume jurisdiction over the affected children.

Mandating a finding of culpability at the jurisdictional phase contravenes the established purpose of the statutory scheme which is to protect children from an unfit home environment and to preserve the existence of the family unit, if the latter alternative is at all possible. *Sterling, supra,* p 339; *Jacobs, supra,* p 3 (BOYLE, J., dissenting).

The newly amended juvenile code provisions illustrate these legislative goals. For example, MCL 712A.1; MSA 27.3178(598.1) instructs the probate courts to construe the juvenile code liber-

ally "to the end that each child coming within the jurisdiction of the court shall receive the care, guidance, and control, *preferably in his or her own home,* as will be conducive to the child's welfare . . . ." (Emphasis added.) Furthermore, § 18f of the act mandates that if an agency, in a § 2(b) proceeding, advises the court against placing the child in the custody of the parents, that agency must prepare a report setting forth, among other things, the "[e]fforts to be made by the agency *to return the child to his or her home."* MCL 712A.18f(3)(c); MSA 27.3178(598.18f)(3)(c) (emphasis added). Similarly, according to § 19, if a child is placed in foster care, the court must hold a regular "review hearing" (every ninety-one days) in order to evaluate "the performance of the child, the child's parent, guardian, or custodian, the juvenile worker, and other persons providing assistance to the child and his or her family." MCL 712A.19(2); MSA 27.3178(598.19)(2). This section also requires that the court, at each review hearing, determine "[w]hether there is a reasonable likelihood that the child *may be returned to his or her home* prior to the next review hearing . . . ." MCL 712A.19(8)(b); MSA 27.3178(598.19)(8)(b). (Emphasis added.)

As illustrated by these provisions and by the record in the instant case, when the state intervenes at the adjudicative (jurisdictional) stage, substantial effort is expended to improve the home situation and, if at all possible, to return the child to the custody of the parents. In the instant matter, when Jeffrey and Forest were originally placed in foster care, the DSS immediately assigned two social workers to the case. The workers interviewed and evaluated all of the involved parties.

In fact, because of her serious health problems, the DSS required the respondent mother to be examined by various medical doctors and psychologists. Later, at the dispositional hearing, one of the workers presented a fair and workable placement plan whereby the children would be returned to the custody of their parents within a month approximately. This plan was, in fact, adopted by the probate court. See n 5.

In our view, requiring "a finding of culpable neglect before the state's resources may be employed" to help remedy unsatisfactory living conditions would undoubtedly frustrate the Legislature's established goals. See *Jacobs, supra,* p 3 (BOYLE, J., dissenting). We also believe that requiring a finding of culpable neglect at this early stage would improperly shift the focus of the proceeding from the child to the parent.

IV

Having examined the record in the instant case, we are persuaded that the probate court properly assumed jurisdiction over the respondent's children. According to MCR 5.908(A)(1)(a) and (C)(1), a court's exercise of jurisdiction must be supported by a preponderance of the evidence. See, e.g., *In re Riffe, supra,* p 669. In the instant case, however, because the children are members of the Chippewa Tribe, the Indian Child Welfare Act, 25 USC 1901 *et seq.,* applies[13] and the appropriate standard,

---

[13] The probate court acknowledged this fact on the record at the adjudicative hearing:

Before we go any further I should indicate that there is a notification of membership in the Tribe, and one of the allegations admitted to in the petition is obviously the tribal membership, which was admitted, and there is a representative of the Tribe here, Ms. Christine Moody, and that obviously the Indian Child Welfare Act would apply in this particular case. So there is no confusion on that.

therefore, is "clear and convincing evidence."

Section 1912(e) of the act provides that a child may not be placed in foster care unless there is "a determination, *supported by clear and convincing evidence,* including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (Emphasis added.)[14]

Having observed the admissions and testimony at the adjudicative hearing, the probate court determined that it should assume jurisdiction over the Jacobs children and that they should remain in temporary foster care. The probate court expressly stated that its determination was supported "by clear and convincing evidence."[15]

Respondent Smith admitted that she had suffered a stroke and that the resulting physical limitations severely impaired her ability to provide proper or direct care to her sons. The respondent also testified that she would require live-in assistance in caring for her children and that she had not yet secured a home for the family. Apparently, at the time of the hearing, the respondent father was also unable to care for the children because his mother, with whom he was then living, was recovering from surgery.

[14] A higher standard of proof for final termination is similarly required under the act. Section 1912(f) provides:

No termination of parental rights may be ordered in such proceeding in the absence of a determination, *supported by evidence beyond a reasonable doubt,* including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. [Emphasis added.]

[15] In light of the applicability of the Indian Child Welfare Act in the instant case, we find that the Court of Appeals erroneously applied the "preponderance of the evidence" standard.

We disagree with Justice LEVIN's assertion that there is no evidence of "neglect" in this case. *Post,* p 42. The respondent herself admitted that her children had not been receiving "proper" care and that the family was, at the time, without a place in which to live. These facts, in our view, provide adequate evidence of "neglect" for purposes of jurisdictional § 2(b)(2).

We acknowledge the distressing nature of the respondent's situation and commend her for coming forward to the DSS when she was unable to care for her children. We recognize that the respondent has not intentionally or culpably neglected her children. The purpose of the juvenile code, however, is to protect children from an unfit home, "not to punish bad parents." *Sterling, supra,* p 339. Were we to require a showing of culpable neglect before a probate court may exercise jurisdiction, an entire class of children, i.e., those neglected by blameless parents, would remain neglected.[16]

Accordingly, we hold that culpability is not a prerequisite for probate court intervention under § 2(b)(2). In light of the respondent's admissions and other evidence presented at the adjudicative

[16] We disagree with the respondent's assertion that our holding would have a chilling effect on disabled or handicapped parents whose illnesses interfere with their ability to care for their children. According to the respondent, such parents would be dissuaded from approaching the DSS for assistance out of fear that they will lose custody of their children.

This contention, in our view, belies the stated purpose of the juvenile code which is to attempt to improve the home environment and to keep the family unit intact whenever possible. Moreover, as stated above, the respondent's assertion is wholly unsupported in the record before us. In the instant case, it is quite clear that the DSS and the probate court intended to use every possible means to improve the children's homelife and to reunite them with their parents. In fact, at the conclusion of the dispositional hearing, the court stated on the record that its long-term plan was "to terminate jurisdiction" as soon as the home environment had improved sufficiently.

hearing, we find that the home environment was unfit for Jeffrey and Forest and that the court's exercise of jurisdiction pursuant to § 2(b)(2) was supported by clear and convincing evidence. The decision of the Court of Appeals is reversed.

BRICKLEY, GRIFFIN, and ARCHER, JJ., concurred with RILEY, C.J.

LEVIN, J. (*dissenting*). We agree with the majority that § 2(b)[1] does not provide for a finding of "culpable" neglect. It does, however,—absent a finding of "cruelty, drunkenness, criminality or depravity"—require a finding of "neglect."[2] A finding that the home or environment "is an unfit place for the child to live in" does not suffice to confer jurisdiction unless the home or environment is unfit "by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of the parent."[3]

We would vacate the decision of the Court of

[1] At the time this action arose, § 2(b) provided:

Except as otherwise provided in this section, the juvenile division of the probate court shall have:

* * *

(b) Jurisdiction in proceedings concerning any child under 17 years of age found within the county:

(1) Whose parent or other person legally responsible for the care and maintenance of the child, when able to do so, neglects or refuses to provide proper or necessary support, education as required by law, medical, surgical, or other care necessary for his or her health or morals, or who is deprived of emotional well-being, or who is abandoned by his or her parents, guardian, or other custodian, or who is otherwise without proper custody or guardianship.

(2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, or other custodian, is an unfit place for the child to live in. [MCL 712A.2; MSA 27.3178(598.2).]

[2] *Id.* See subsection (2).
[3] *Id.*

Appeals and remand the cause to the Court of Appeals for further proceedings for the following reasons:

(1) Although there is no statutory requirement of "culpability" there is a statutory requirement of "neglect" under both subsection (1) and subsection (2) of § 2(b).[4]

(2) Although the jurisdictional allegation in the amended petition was grounded in § 2(b)(1), the judge found neglect on the basis of § 2(b)(2).

(3) There was no evidence that either of Lorraine Smith's two children, who had been in foster care under the supervision of Protective Services for over six weeks when the amended petition was filed, were in fact neglected.

(4) While the judge found that jurisdiction was established under § 2(b)(2), he did not expressly find neglect or state how the children had been neglected or that Lorraine Smith's physical limitations and multiple residences had resulted in neglect of the children.[5]

I

The amended petition was grounded on § 2(b)(1) and not § 2(b)(2).[6]

[4] See n 1.

[5] The judge said only:

Further, the Court finds that Lorraine Smith *presently, at this point in time* is without a proper residence along with her inability to care for her children. [Emphasis supplied.]

[6] The amended petition alleged that Jeffrey and Forest Jacobs "come within the provisions of . . . § 2(b)(1), (2)" on the following basis:

Allegations:
Whose parents or other persons legally responsible for the care and maintenance of such children, when able to do so,

Lorraine Smith admitted the allegations in the amended petition that (1) she had physical limitations which impaired her ability to provide proper or direct care to her children, Jeffrey Jacobs[7] and Forest Jacobs,[8] "to wit: complications from brain surgery which took place on or about April 19, 1986, to relieve a right temporal lobe hematoma;" (2) in the seven weeks between her return to Sault Ste. Marie in early October, 1986, and the filing of the amended petition in late November, 1986, she had lived in no less than seven residences including her parents' home, a domestic violence shelter, a Hiawathaland Home, and in at least two adult foster home placements; (3) her children had been placed in foster care since October 10, 1986, one week after she returned to Sault Ste. Marie.

The amended petition alleged and Lorraine Smith "admitted" that she and her husband, Scott Jacobs, had made regular visits and contact with their children.

Lorraine Smith denied that she was currently without proper residence to establish adequate care for her children, and the probate judge said that testimony would be taken on that issue only.

Lorraine Smith testified at the December 3, 1986, adjudication hearing that she had lived for

neglects to provide proper or necessary support or other care necessary for his or her health or well-being or who is abandoned by his or her parents, guardian, or other custodian, or is otherwise without proper custody or guardianship to wit: [there then followed the specific factual allegations regarding Lorraine Smith's physical impairment, residences and other matters].

Although the amended petition stated that the children came within the provisions of both subsection (1) and subsection (2) of § 2(b), the foregoing is almost word for word the substance of subsection (1) thereby limiting the specific factual allegations thereafter following to a claim arising under § 2(b)(1). See n 1 for text of § 2(b).

[7] Date of birth June 4, 1984.

[8] Date of birth March 27, 1986.

the two preceding weeks in the three bedroom
home of her cousin, Alvin Menard, on Superior
Street. She planned on renting a trailer at 4
o'clock in the afternoon on the day of the hearing
from Howard Talentino at 508 West 24th Street
and said that she had saved sufficient money to do
so. She conceded that she could not care for her
children at her cousin's home, but said she had
made arrangements with Evelyn Sasuchi[9] to stay
with her at the trailer twenty-four hours a day
and that she could take care of the children with
Evelyn Sasuchi's assistance. Lorraine Smith said
she needed assistance in changing diapers and
holding the children because she had limited use
of her left hand. Evelyn Sasuchi would be joining
Lorraine Smith as soon as she had possession of
the trailer.

There were no other witnesses and no other
evidence. Our review is necessarily limited to the
record made at the adjudication hearing. We may
not properly consider anything else.

After both sides rested, the probate judge pro-
ceeded, without inviting argument by counsel, to
announce that, on the basis of Lorraine Smith's
admissions of allegations in the petition and his
finding that she "presently, at this point in time is
without a proper residence along with her inabil-
ity to care for her children," the court would
assume jurisdiction under § 2(b)(2), the language of
which he then read into the record.

The judge continued that he was satisfied that
he had jurisdiction by clear and convincing evi-
dence and even "beyond a reasonable doubt that
there is jurisdiction in this matter."

When the judge finished announcing his deci-
sion, Lorraine Smith's lawyer stated for the record

---

[9] She had met Evelyn, who was eighteen years old, at the domestic
violence shelter on October 6.

his position "that the actions that Lorraine Smith has taken do not constitute neglect. Her physical incapacity does not constitute neglect." He added that it was Lorraine Smith who "contacted the Department of Social Services asking for assistance in the placement of her children."

The judge responded stating that the decision of the Court of Appeals, *In re McDuel,* 142 Mich App 479; 369 NW2d 912 (1985), relied on by Lorraine Smith's lawyer, concerned termination of parental rights but did not have application at the adjudication phase for the purposes of "determining jurisdiction under neglect as defined" in § 2(b)(2).

II

All the allegations in the amended petition concerned Lorraine Smith. None concerned her children.

There was no evidence concerning the relationship between Lorraine Smith's physical limitations and multiple residences and the claim of neglect respecting the care of her children who had been in foster care under the supervision of Protective Services for over six weeks when the amended petition was filed. There was no evidence that Lorraine Smith's physical limitations, that "impaired" her ability to provide "proper or direct care" to the children, or peripatetic residences, had resulted in neglect of the children, or that the children had been thereby affected in some manner that might be thought to amount to neglect. There was no evidence that the children were found in a state of neglect.

To be sure, Lorraine Smith had admitted that her physical affliction "impaired" her ability to provide proper or direct care for her children. It appears that she was without adequate shelter

arrangements for her children in early October, 1986. Recognizing their plight, she sought the assistance of Protective Services who placed the children in foster care. The majority "commend[s]" her for coming forward.[10] That was not neglect.

Except for the conclusory statement that "at this point in time" Lorraine Smith was "without proper residence,"[11] the judge did not indicate why he had concluded—if he had so concluded—that the trailer Lorraine Smith had planned to rent would not be a proper residence.

Nor did the judge indicate on what basis he concluded—if he had so concluded—that Lorraine Smith would be unable, with the assistance of Evelyn Sasuchi, to diaper, hold and care for her children.

The judge did not explain the relationship between Lorraine Smith's physical limitations and multiple residences and his conclusion that her children were within the jurisdiction of the court, i.e., neglected. Nor was there any finding that the children had in fact been neglected, or, to repeat, evidence that would have supported such a finding. The judge found only that Lorraine Smith had a physical impairment and did not at the time have a proper residence.

The need for specificity in allegation, evidentiary support and fact finding is demonstrated by the judge's non sequitur conclusion that because Lorraine Smith had physical impairments and was without proper residence her children were within the jurisdiction of the court, i.e., neglected.

---

[10] *Ante,* p 41.

[11] The judge said:

> Further, the Court finds that Lorraine Smith *presently, at this point in time* is without a proper residence along with her inability to care for her children. [Emphasis supplied.]

### III

The majority states that the clause, "when able to do so," in § 2(b)(1)—the only subsection in respect to which there are specific factual allegations in the amended petition—"created a 'built-in' culpability requirement," and then concludes, as to subsection 2(b)(2), that under that subsection jurisdiction may be conferred "if the home is *in fact* an unfit place for the child to live." (Emphasis in original.) It is said that under this subsection the inquiry is "into the objective state of being neglected rather than an examination of the individual causes or reasons for the neglect," and that neglect is "the condition of being neglected." *Ante,* pp 33-34. There was no evidence in the instant case that the "condition" of the children was one of neglect or that they were found in a state of neglect.

The majority refers[12] to a dictionary definition of "neglect," "to give little attention or respect to; Disregard; to leave undone or unattended esp[ecially] through carelessness." So defined, there was no neglect. Lorraine Smith did not give little attention or respect to, or disregard her children, or leave them unattended.

Another dictionary similarly states that neglect means, among other things, "to pay no attention or too little attention to; disregard or slight"; "to be remiss in the care or treatment of; to neglect one's family; to neglect one's appearance."[13] It also states, paralleling somewhat a statement in the majority opinion[14] that it also means "the fact or state of being neglected; a beauty marred by neglect."

---

[12] *Ante,* p 34.

[13] *Random House Dictionary of the English Language: Unabridged Edition,* 2d ed.

[14] *Id.*

Conceding that the term "neglect" may include a child who has been subjected to neglect, the question remains, what is neglect? To say in effect that it means a child whose home is in fact an unfit place without regard to whether there was neglect is to read the statutory standard out of the statute.

While the term "neglect" does not require a finding of culpability, it does require a finding of inattention, disregard, remiss, omission, through indifference or carelessness, a mischoice. Neglect comes from the Latin "legere," "to gather (esp fruit), hence to collect, to assemble, hence to choose," and thus, in the negative, "not to gather or assemble, hence to disdain, to neglect."[15]

There was no evidence that Lorraine Smith made a choice to use whatever funds she had to purchase personal luxuries rather than to provide for her children. There was no indication that she did not do whatever she was able to do for her children. It appears that their needs were in fact attended to by Lorraine Smith, private agencies, and Protective Services.

There was no evidence or finding that the children were in a state of neglect. There was no evidence that at the time of the hearing the children were or had been without proper care. The evidence was to the effect that when Lorraine Smith found she could not adequately care for the children, she sought assistance from Protective Services rather than permit the children to be in a state of neglect. At the time of the hearing, they were in foster care and presumably had not been neglected.

There was no evidence that would have justified the judge in concluding that the children would be

---

[15] Partridge, Origins (New York: Macmillan Co, 1958), pp 345-346.

neglected if they were to have moved into the trailer with their mother and Evelyn Sasuchi. Accordingly, even under the majority's construction of "neglect," there was no evidence, let alone clear and convincing evidence, that the children were neglected or that their home or environment was an unfit place for them to live.

IV

The majority finds support for its construction of the statute in a 1988 amendment providing for termination of parental rights "without regard to intent,"[16] stating:

If culpability or blameworthiness is not required for final disposition, it certainly would not be required at the initial adjudicative stage, where the court merely decides whether or not to assume jurisdiction over the affected children.[17]

The 1988 amendments, read as a whole, indicate that the Legislature intended a high threshold before there is judicial intervention or children are taken, even temporarily, from the custody of a parent.[18] It appears that the Legislature intended

---

[16] There is no need to review what the Court of Appeals has said in construing MCL 712A.19a(e); MSA 27.3178(598.19a)(e) in order to decide this case which arises under § 2(b).

[17] *Ante,* p 37.

[18] The *statute as amended provides in part:*

If a petition [alleging that a child comes within the provisions of § 2(b)] is authorized, the court may *order* placement of the child with *someone other than a parent* if the court after hearing determines that *both* of the following conditions exist:
(a) Custody of the child with a parent, guardian, or custodian presents a substantial risk of harm to the child's life, physical health, or mental well-being and *no provision of service or other arrangement except removal* of the child is reasonably available to adequately safeguard the child from such risk.

(b) Conditions of custody of the child away from a parent, guardian, or custodian are adequate to safeguard the child's health and welfare. [MCL 712A.13(a)(4); MSA 27.3178(598.13a)(4). Emphasis added.]

(1) If, in a proceeding under section 2(b) of this chapter, *an agency advises the court against placing a child in the custody of the child's parent,* guardian, or custodian, the agency *shall report* in writing to the court *what efforts were made to prevent the child's removal* from his or her home or the efforts made to rectify the conditions that caused the child's removal from his or her home. The report shall include all of the following:

(a) If services were provided to the child and his or her parent, guardian, or custodian, *the services, including in-home services, that were provided.*

(b) If services were not provided to the child and his or her parent, guardian, or custodian, *the reasons why services were not provided.*

(c) Likely harm to the child if the child were to be separated from his or her parent, guardian, or custodian.

(d) Likely harm to the child if the child were to be returned to his or her parent, guardian, or custodian.

(2) *Before the court enters an order of disposition in a proceeding under section 2(b) of this chapter, the agency shall prepare a case service plan* which shall be available to the court and all the parties to the proceeding.

(3) The case service plan *shall provide for placing the child in the most family-like setting* available and in as close proximity to the child's parents' home as is consistent with the best interests and special needs of the child. The case service plan shall include, but not be limited to, the following:

\* \* \*

(c) Efforts to be made by the agency *to return the child to his or her home.*

(d) *Schedule of services to be provided to the parent,* child, and if the child is to be placed in foster care, the foster parent, *to facilitate the child's return to his or her home* or to facilitate the permanent placement of the child.

\* \* \*

(4) The court shall consider the case service plan and the evidence offered bearing on disposition before the court enters an order of disposition. *The order of disposition shall state whether reasonable efforts have been made to prevent the child's removal from his or her home or to rectify the conditions that caused the child's removal from his or her home.* The court may order compliance with all or any part of the case service plan as the court considers necessary. [MCL 712A.18f; MSA 27.3178(598.18f). Emphasis added.]

by the 1988 amendments that there be a higher standard under § 2(b) than under former § 19a(e).[19] To read the amendment of § 19a, eliminating the need for a finding of intent at the termination stage, as also lowering the standard for judicial intervention under § 2(b) is, with respect, a misreading of the 1988 amendments.[20]

Although the Legislature changed § 19a(e), it did not eliminate the limitations set forth in § 2(b)—it did not excise either "*when able to do so, neglects or refuses to provide proper or necessary support*" (§ 2[b][1]) or "*by reason of neglect . . .* is an unfit place." (Section 2[b][2]).

The probate court is a statutory court of limited jurisdiction, and not a court of general jurisdiction. This court is obliged to give meaning and content to the statutory limitations in § 2(b) on the probate court's authority. Especially now that the Legislature has declared that the probate court has the authority to terminate parental rights "without regard to intent," the initial decision that the probate court has jurisdiction becomes even more critical. The initial threshold that there be neglect cannot properly be ignored.

Lorraine Smith had a temporary physical handicap. She had only recently arrived in Michigan. She was separated from her husband. She turned to private agencies and then to Protective Services. The statute does not require that when Protective Services provides assistance that it seek probate court jurisdiction of the children and supervision of the parents.

---

[19] Now MCL 712A.19a; MSA 27.3178(598.19a).

[20] Under the 1988 amendments, foster care is to be a last resort. Because Protective Services cannot be relied on to provide necessary support services as a matter of course, the probate court must require that it demonstrate that it has provided necessary services, *including in-home services,* and that nevertheless the conditions requiring removal of the child from the parental home cannot be rectified.

Judicial intervention may be required where the parents are resistant, if they decline necessary services. In the instant case Lorraine Smith sought assistance. There was no need for judicial intervention.

A parent who is physically handicapped may need the assistance of a spouse, parent, grandparent, friend, domestic help, day worker, baby-sitter, in caring for a child. Lorraine Smith's physical handicap was not neglect. There was no suggestion that she had the financial resources to provide more adequate shelter but nevertheless failed to do so.

There was no basis in the record for a finding that she was not a caring, concerned mother who wanted to provide for her children. Her action in taking her children to Protective Services for shelter was not neglect, nor were the children in an unfit home unless the home in which Protective Services placed them was an unfit home.

The probate court had no authority to assume jurisdiction of Lorraine Smith's children and thereby empower itself at some future time to terminate her parental rights "without regard to intent," simply because—rather than neglect her children—she turned to Protective Services for assistance in caring for her children.

v

If Lorraine Smith had become ill, lost the support of her spouse and her job, and was evicted for nonpayment of rent—a misfortune that might befall any person—and had then entrusted the care of her children to a relative, friend, or a private agency while she recovered from her illness and recouped her financial resources, there would surely have been no basis for a finding of neglect

as long as the relative, friend, or agency cared properly for the children. A different result is not warranted simply because Lorraine Smith entrusted the care of her children to Protective Services.[21]

A probate court may not draw an inference of neglect on the basis that a parent resorted to Protective Services for assistance or on the basis that it provided assistance. If such an inference were warranted, then a parent who accepts assistance from the Department of Social Services— whether it be money for shelter, food, or medical care or takes some other form—for the care of his children is in jeopardy of a finding by a probate court that his children are neglected.

VI

Contrary to a statement in the majority opinion,[22] the record does not indicate that any effort, let alone a "substantial" effort, was expended by "the state" "to improve the *home* situation and, if at all possible, to return the child to the custody of the parents." (Emphasis added.) Lorraine Smith turned to Protective Services to provide shelter for her children. Because of her handicap, she also required assistance in changing diapers and holding the children. She had met an eighteen-year-old woman who was willing to assist her, and Lorraine Smith said she was making arrange-

---

[21] It appears that Lorraine Smith was separated from her husband. The record at the adjudication hearing does not indicate whether she was ever employed or the sources of financial support for her and her children.

Some parents do not work. Spouses, family, friends, private agencies, and federal and state general welfare programs provide funds for their support and the support of their children. Parental failure to provide for their own support and the support of their children does not justify a finding that the parents neglected their children.

[22] *Ante*, p 38.

ments to rent a trailer. If Protective Services had desired to improve her "home situation" and return the custody of the children to her, rather than to her husband and his mother who a Protective Service worker may have thought to be a more appropriate placement, it would have assisted her in renting the trailer or some such economical shelter and in obtaining the services of such a person to assist her in diapering and holding her children.

The placement plan[23] was neither "fair" nor "workable."[24] It was a plan to return the children to her husband and his mother which was not workable—they were not prepared to assume that responsibility—and it was not fair to Lorraine Smith who went to Protective Services for assistance in caring for her children and not to transfer custody of her children to someone else.

Contrary to a statement in the majority opinion,[25] there need not be a finding of neglect, culpable or otherwise, " 'before the state's resources may be employed.' " There is nothing in the statute that requires judicial intervention before Protective Services can provide assistance. Indeed, the statute contemplates that the state's resources shall be employed to provide necessary assistance, and that judicial intervention shall be deferred unless there is neglect and providing services, including in-home services, will not rectify the situation so that judicial intervention is then required.

We would remand this case to the Court of Appeals.

---

[23] This plan was presented after the probate court assumed jurisdiction, and hence has no materiality on the issue whether the probate court correctly decided to assume jurisdiction.

[24] *Ante,* p 39.

[25] *Ante,* p 39.

CAVANAGH, J., concurred with LEVIN, J.

BOYLE, J., took no part in the decision of this case.